IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| ERIC WANNER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | NO. 3:18-cv-00767 |
| v. | ) | |
| | ) | JUDGE RICHARDSON |
| UNDER ARMOUR, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION

Pending before the Court is Defendant Under Armour, Inc.'s Motion for Summary Judgment (Doc. No. 27, "Motion"), supported by an accompanying brief (Doc. No. 27-1). Plaintiff Eric Wanner filed a response (Doc. No. 29), and Defendant filed a reply (Doc. No. 35, "Reply"). For the reasons stated below, the Motion will be denied.

## FACTUAL BACKGROUND[1]

On February 23, 2015, Defendant, Under Armour, Inc., hired Plaintiff, Eric Wanner, to fill the position of Senior Director of Southeast Operations of Defendant's Nashville Distribution House ("NDH") in Nashville, Tennessee. (Doc. No. 28 at ¶ 1). Plaintiff's initial role was to fully integrate the NDH in terms of construction and configuration of the physical building, and to hire his managerial staff. (*Id.* at ¶ 2). During the spring of 2016, Plaintiff's role transitioned from integrating the NDH to managing operations, which is the role he served until his termination on August 28, 2020. (*Id.* at ¶ 3; Doc. No. 30-2).

---

[1] The following facts, unless somehow qualified herein (as for example by "[deponent] testified that . . ."), are taken as true for purposes of this motion, because they are either: (1) asserted and evidentially supported by one party and not rebutted by the other side; (2) otherwise not in genuine dispute; (3) asserted and evidentially supported by the non-movant and thus credited by this Court even if disputed by the movant; or (4) subject to judicial notice. All testimony referred to herein is deposition testimony.

During Plaintiff's tenure, his performance reviews were positive. (Doc. No. 30-1). Specifically, his most recent reviews—Plaintiff's 2016 year-end review and his 2017 mid-year review (completed on July 31, 2017, roughly a month before his termination)—rate his performance as "exceeded expectations," (Doc. No. 37-1 at ¶ 3), and states that Plaintiff "Meets UA's high expectations" (Doc. No. 37-1 at ¶ 4).

Plaintiff went through a contentious divorce during Plaintiff's employment with Defendant. (Doc. No. 27-6 at 5).[2] At the end of 2016 or beginning of 2017, Plaintiff began to seek out mental health treatment as he was experiencing symptoms of lack of focus, insomnia, hopelessness, depression, and a short temper. (Doc. No. 37-1 at ¶ 45; Doc. No. 27-6 at 10). Plaintiff was diagnosed with an adjustment disorder sometime in 2017. (Doc. No. 27-6 at 10).

During July 2017, a safety incident occurred at NDH. The event was investigated, and the investigation resulted in the termination of Defendant's safety director. (Doc. No. 37-1 at ¶ 33). Plaintiff was not disciplined, coached, counseled, or written up for the safety incident, and his mid-year review did not mention the incident. (Doc. No. 37-1 at ¶¶ 31-32).

During a meeting of management-level employees in early August 2017, Plaintiff became upset and cursed at his co-workers, and then left the meeting. (Doc. No. 37-1 at ¶ 61). Thereafter, one of the managers made a formal complaint to Defendant's Human Resources Department regarding Plaintiff's behavior. (Doc. No. 28 at ¶ 33). Thereafter, Defendant conducted an investigation into Plaintiff's conduct. (Doc. No. 30-2 at 4). The investigation occurred from August 14 to August 16, 2017 in Nashville, and it was conducted by Bill Werner, Plaintiff's direct supervisor (Doc. No. 37-1 at ¶ 6), and Nancy Tucker, Defendant's Senior Director of Teammate Relations (Doc. No. 27-3 at 6). (*Id.*). Plaintiff testified that he informed Ms. Tucker of his

---

[2] When citing to a deposition transcript, the Court will cite to the page numbers affixed to the document by the Clerk, understanding that a single page filed with the Clerk may contain four different pages from a deposition transcript.

adjustment disorder on August 16, 2017. (Doc. No. 26-7 at 23). Additionally, Plaintiff's handwritten notes that he testified were made contemporaneously with, or shortly after, events occurring indicate that he informed Ms. Tucker: (a) on August 9, 2017 that he had been seeing a therapist; and (b) on August 17, 2017 his specific diagnosis. (Doc. No. 30-9 at 1-2). However, Ms. Tucker testified that she did not recall Plaintiff informing her of his diagnosis. (Doc. No. 27-3 at 82-83).

Plaintiff also testified that when speaking to Ms. Tucker on August 16, 2017, he requested FMLA leave and inquired into the procedure. (Doc. No. 26-7 at 23). At this time, he requested FMLA leave. (Doc. No. 35-1 at 2). Ms. Tucker testified that she recalled having a conversation about FMLA leave (without "recall[ing] the exact specifics" of the conversation), and that she directed Plaintiff to reach out to Defendant's benefits department in regard to seeking FMLA leave and provided him with the applicable contact information. (Doc. No. 37-1 at ¶ 14). Following her direction, Plaintiff contacted the benefits department. (Doc. No. 27-6 at 24). Plaintiff testified that he requested FMLA paperwork during this phone call but nevertheless was never provided such paperwork. (*Id.*).

On August 17, 2017, Plaintiff's medical provider provided Plaintiff with a note, dated August 17, 2017, excusing him from work until September 5, 2017. (Doc. No. 30-8). Plaintiff testified that he was terminated before he was able to provide the note to Defendant's management. (Doc. No. 27-6 at 24).

On August 28, 2017, the decision to terminate Plaintiff was made collectively by Ms. Tucker, Mr. Werner, and five other upper level employees. (Doc. No. 28 at ¶ 49). In a report labeled "Termination Summary Notes," Mr. Werner reported that the findings of the investigation conducted on August 14 through 16 were: Plaintiff had lost the trust and respect of the team; he

lacked communication and vision; he set unrealistic goals for the team; he was not engaged in the day-to-day operations; and his personal issues affected his performance and relationships with leaders. (Doc. No. 30-2). The safety incident that occurred in July 2017, and Plaintiff's conduct during the meeting that occurred on August 2, 2017, were also cited as reasons for Plaintiff's termination. (*Id.*).

Plaintiff filed his Complaint in this Court on August 16, 2018, alleging three counts: violation(s) of the Americans with Disabilities Act ("ADA") based on theories of discrimination and retaliation (Count One), violation(s) of the Family Medical Leave Act ("FMLA") based on theories of interference and retaliation (Count Two), and violation(s) the Tennessee Disabilities Act ("TDA") based on theories of discrimination and retaliation (Count Three). (Doc. No. 1). On November 11, 2019, Defendant moved for summary judgment as to all claims. (Doc. No. 27).

## LEGAL STANDARD

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. *See id.* at 248. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine[.]'" *Id.*

A fact is "material" within the meaning of Rule 56(c) "if its proof or disproof might affect the outcome of the suit under the governing substantive law." *Anderson*, 477 U.S. at 248. A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a

verdict for the nonmoving party. *Harris v. Klare*, 902 F.3d 630, 634-35 (6th Cir. 2018). The party bringing the summary judgment motion has the initial burden of identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Information Solutions, Inc.*, 901 F.3d 619, 627-28 (6th Cir. 2018). If the summary judgment movant meets that burden, then in response the non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Id*. at 628.

A party asserting that a fact cannot be or genuinely is disputed—i.e., a party seeking summary judgment and a party opposing summary judgment, respectively—must support the assertion by citing to materials in the record, including, but not limited to, depositions, documents, affidavits or declarations. Fed. R. Civ. P. 56(c)(1)(A). In reviewing a motion for summary judgment, this court must view the evidence in the light most favorable to the nonmoving party. *Tlapanco v. Elges*, 969 F.3d 638, 647 (6th Cir. 2020) (quoting *Anderson*, 477 U.S. at 248). Likewise, the court should view the facts and draw all reasonable inferences in favor of the non-moving party. *Pittman*, 901 F.3d at 628. Credibility judgments and weighing of evidence are improper. *Hostettler v. College of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018). As noted above, where there is a genuine dispute as to any material fact, summary judgment is not appropriate. *Id*. The court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question. *Id*. The mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient to survive summary judgment; rather, there must be evidence upon which the jury could reasonably find for the nonmoving party. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

**ANALYSIS**

# I. Family Medical Leave Act

### A. *FMLA Interference*

FMLA interference occurs when an employer "shortchange[s] [an employee's] leave time, den[ies] reinstatement, or otherwise interfere[s] with [an employee's] substantive FMLA rights." *Marshall v. The Rawlings Co., LLC*, 854 F.3d 368, 384-85 (6th Cir. 2017). Plaintiff asserts that Defendant interfered with his FMLA rights by denying him benefits to which he was entitled by failing to provide him with: (a) the required notice of FMLA rights, inasmuch as Defendant never provided him the appropriate FMLA certification forms;[3] and (b) FMLA leave itself,[4] inasmuch as he was terminated shortly after requesting it and before being able to take it. (Doc. No. 29 at 21).

To establish a prima facie claim of FMLA interference, a plaintiff must demonstrate at trial that: (1) he was an eligible employee as defined by the FMLA; (2) the defendant was an employer

---

[3] Failure to provide such notice as required can constitute FMLA interference. *See* 29 C.F.R. § 825.300(e) ("Consequences of failing to provide notice. Failure to follow the notice requirements set forth in this section may constitute an interference with, restraint, or denial of the exercise of an employee's FMLA rights.").

[4] Termination can constitute FMLA interference if such termination results in the employee being unable to fully use FMLA leave. *See Edgar v. JAC Prods.*, 443 F.3d 501, 514 (6th Cir. 2006) (noting that the plaintiff's claim that she was unlawfully terminated during her FMLA leave "is properly construed as invoking the entitlement [(also known as interference)] theory of recovery, since she does not argue that she was terminated *because* she invoked her FMLA rights" and she alleged her termination interfered with her ability to take FMLA leave). *Edgar* suggests a distinction between termination that support an FMLA interference claim and termination that supports an FMLA retaliation claim. The latter claim, not surprisingly, requires that the termination have resulted from a prior invocation of FMLA rights. But the former claim does not; the former claim requires only that the termination result in the plaintiff being denied the FMLA leave to which he was entitled. The question presumably then becomes, given the final element of a prima facie case of FMLA interference, whether the plaintiff was actually "entitled" to the post-termination FMLA leave he was denied as a result of the termination. It appears that, for purposes of the final element of a prima facie case, a plaintiff was "entitled" to that FMLA leave if he was an eligible employee as defined by the FMLA; the plaintiff need not also have been "entitled" not to have been terminated from the employment upon which the FMLA leave would have been based. (If plaintiff was not "entitled" in this latter sense, that would not defeat the plaintiff's prima facie case but could suggest that the defendant-employer had a legitimate, non-discriminatory, and non-pretextual reason for interfering with the FMLA leave to which the plaintiff otherwise was entitled).

In the present case, Plaintiff has asserted a cognizable claim of FMLA interference, *i.e.*, that his termination resulted in denial of FMLA leave to which he was "entitled" in the relevant sense. As discussed below, Plaintiff additionally has asserted a cognizable claim of FMLA retaliation, *i.e.*, that his termination resulted from his invocation of FMLA rights.

as defined by the FMLA; (3) the plaintiff was entitled to leave under the FMLA; (4) the plaintiff gave the defendant notice of his intention to use FMLA leave; and (5) Defendant denied him FMLA benefits to which he was entitled. *Edgar v. JAC Prod., Inc.*, 443 F.3d 501, 507 (6th Cir. 2006) (citation omitted).

FMLA interference claims follow the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1972). *See Donald v. Sybra, Inc.*, 667 F.3d 757, 762 (6th Cir. 2012). Thus, if a plaintiff establishes his or her prima facie case, the burden shifts to the defendant to offer a legitimate non-discriminatory explanation for its action. *See id*. If the defendant does so, the burden shifts back to the plaintiff, who must introduce evidence showing that the proffered explanation is pretextual. See id. at 761-62.

Here, the parties do not dispute that the first two elements of Plaintiff's FMLA interference claim are met—*i.e.*, that for purposes of the FMLA, Plaintiff was an eligible employee and Defendant was an employer. (Doc. No. 27-1 at 8). Defendant argues that it is entitled to summary judgment because the undisputed facts demonstrate that Plaintiff cannot prove the final three elements of his FMLA interference claim. (*Id.*).

i. *Element Three: Plaintiff was entitled to leave under the FMLA.*

Under the FMLA, an eligible employee is entitled to leave for, among other things, a serious health condition that makes the employee unable to perform their job, or to care for a spouse or parent who has a serious health condition. 29 U.S.C. §§ 2612(a)(1)(C)-(D). A "serious health condition" is defined as "an illness, injury, impairment, or physical or mental condition" that involves either "inpatient care in a hospital, hospice, or residential medical care facility" or "continuing treatment by a health care provider." 29 U.S.C. § 2611(11). "A serious health condition involving continuing treatment by a health care provider" includes, among other things, "[a] period of incapacity of more than three consecutive, full calendar days[.]" 18 C.F.R. §

825.115(a). The term incapacity means "inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefore, or recovery therefrom." 29 C.F.R. § 825.113(b).

Defendant argues that Plaintiff cannot demonstrate that he was entitled to leave under the FMLA, because Plaintiff "did not suffer from any period of incapacity" and "the only time Plaintiff missed work was the two-week suspension following complaints of Plaintiff's aggressive behavior and use of profanity towards others during meetings." (Doc. No. 27-1 at 10). In response, Plaintiff argues that Plaintiff's "testimony regarding ongoing counseling and treatment with medication satisfies the 'continuing treatment' prong." (Doc. No. 29 at 21).

The Court finds that Plaintiff has produced more than a scintilla of evidence on this element such that it should go to a jury. During Plaintiff's deposition, he discussed the continued treatment of his adjustment disorder, (Doc. No. 27-6 at 10); if credited by a jury, such testimony would establish what amounts to "treatment by a health care provider on at least one occasion, which result[ed] in a regiment of continuing treatment under the supervision of the healthcare provider." 18 C.F.R. § 825.115(a).

Additionally, "a plaintiff may prove 'incapacity' through evidence that a health care provider determined that the plaintiff was unable to work because of the injury or illness." *Whitaker v. Bosch Braking Sys. Div. of Robert Bosch Corp.*, 180 F. Supp. 2d 922, 930 (W.D. Mich. 2001) (citing *Brannon v. OshKosh B'Gosh, Inc.*, 897 F. Supp. 1028, 1037 (M.D. Tenn. 1995)). During his deposition, Plaintiff also discussed documentation from his physician that recommended that he take time off work due to his adjustment disorder. (Doc. No. 27-6 at 24;

Doc. No. 30-8). The note, dated August 17, 2017,[5] states that "[i]t is in [the physician's] medical opinion that [Plaintiff] should be excused from attending work due to their medical condition" from August 17, 2017 through September 5, 2017. (Doc. No. 30-8). A reasonable juror could find that this evidence establishes that plaintiff was suffering from a "serious health condition" that required him to miss work in excess of three days, the minimum required by the regulations to trigger FMLA eligibility. *See Hobart v. Behavioral Connections of Wood Cty., Inc.*, No. 3:03CV7313, 2004 WL 1474652, at *7 (N.D. Ohio June 17, 2004) (explaining that the plaintiff, who suffered from adjustment disorder, met his burden to survive summary judgment when he produced a "notice" from his physician that "certified that [the] plaintiff suffered from a health condition that required continuing treatment" and recommended time off work for more than three days, although the "notice did not explain the nature of plaintiff's health condition").

Accordingly, viewing the facts most favorably to Plaintiff, a reasonable juror could find that Plaintiff's condition qualifies as a "serious health condition" under 29 C.F.R. §§ 825.115(a).

ii. *Element Four: Plaintiff gave Defendant notice of his intention to request FMLA leave.*

It is well settled that "[t]o invoke the protection of the FMLA, an employee must provide notice, and a qualifying reason for requesting the leave." *Wallace v. FedEx Corp.*, 764 F.3d 571, 586 (6th Cir. 2014). Importantly, "[t]he employee need not expressly assert rights under the FMLA or even mention the FMLA." *Id.* Rather, "[a]n employee gives his employer sufficient notice that he is requesting leave for an FMLA-qualifying condition when he gives the employer enough

---

[5] It does not matter that Plaintiff (in his version of facts) informed Ms. Tucker of his serious medical condition prior to his physician's production of this note. "[T]his medical determination need not be made at any particular stage of the illness or at any particular point post-injury. As long as the medical provider's assessment of medical history and of the patient's current condition supports the professional assessment given, and that assessment is that an absence in excess of three days is necessary to proper treatment, a plaintiff employee should withstand summary judgment as to this particular prong of his . . . required showing." *Olsen v. Ohio Edison Co.*, 979 F. Supp. 1159, 1166 n.11 (N.D. Ohio 1997).

information for the employer to reasonably conclude that an event described in the FMLA . . . has occurred." *Id*. The employee's burden is not a heavy one. *Id*. The sufficiency of notice "is an intensely factual determination." *Donald*, 667 F.3d at 761.

Defendant argues that the undisputed facts demonstrate that Plaintiff did not provide adequate notice. Defendant points out that the regulations permit employers to condition FMLA-protected leave upon an employee's compliance with the employer's usual notice and procedural requirements, absent unusual circumstances. (Doc. No. 27-1 at 10 (citing 19 C.F.$. § 825.302(d)). Defendant then asserts that "Plaintiff admitted he voluntarily chose not to request and submit any paperwork to exercise his rights under the FMLA" (Doc. No. 27-1 at 10-11). In response, Plaintiff argues that he did not file for FMLA leave because "[Plaintiff] was never provided FMLA certification paperwork, despite his requests, but his intention to take leave was otherwise known." (Doc. No. 29 at 21). Plaintiff specifically disputes Defendant's assertion that Plaintiff "never requested any FMLA paperwork," pointing to Plaintiff's deposition testimony. (Doc. No. 28 at ¶ 39).

By making its argument regarding lack of notice, Defendant implies that Defendant's FMLA notice procedures require an employee to submit FMLA certification paperwork when requesting FMLA leave. But Defendant does not cite any policy of Defendant (in the record or otherwise) that requires Plaintiff to submit FMLA certification paperwork to place Defendant on notice of a FMLA leave request. Moreover, even assuming such policy existed, for the assertion that Plaintiff never requested FMLA paperwork, Defendant cites a portion of Plaintiff's deposition transcript. (Doc. No. 28 at ¶ 39 (citing Doc. No. 27-6 at 89:2-92:13)). After reviewing the cited portion of Plaintiff's deposition testimony, the Court finds that the cited portion of the testimony

does not support this assertion. Specifically, during Plaintiff's deposition, the following testimony occurred:

> Q: Did you—when you requested the FMLA paperwork from CCA [(Defendant's benefits coordinator)], was that over the phone, via email?
>
> A: So I had the conversation with them on the phone, . . . we talked about it and just asked what the process was and what I needed to do.
>
> . . .
>
> Q: Okay. Were you ever provided with FMLA paperwork?
>
> A: No, I was not.

(Doc. No. 27-6 at 89-91). If anything, this testimony suggests (albeit not with the greatest of clarity) that Plaintiff *did* request FMLA paperwork; the deposing attorney assumed this in the question and Plaintiff appears to treat the assumption as an assumption. Thus, this cited testimony fails to aid Defendant in meeting its initial burden as the summary judgment movant to show the absence of a genuine issue of material fact here.

Additionally, it is undisputed that Plaintiff discussed the topic of FMLA leave with his superior, Ms. Tucker. (Doc. No. 37-1 at ¶ 14). In her deposition, Ms. Tucker stated that she referred Plaintiff to Defendant's benefits department after he "asked [her] about the procedure" for taking medical leave, but she did not "recall the specifics" of the conversation. (Doc. No. 27-3 at 35). Plaintiff testified that during this conversation he specifically informed Ms. Tucker of his adjustment disorder diagnosis. (Doc. No. 27-6 at 23-24). As the parties are agreed, he requested FMLA leave at this time from Ms. Tucker. (Doc. No. 35-1 at 2). Following Ms. Tucker's directive, Plaintiff testified, he reached out to Defendant's benefits program using the contact information given to him by Ms. Tucker, spoke to Jennifer Yee, yet was never provided with FMLA certification paperwork. (Doc. No. 27-6 at 24). Although Defendant disputes these facts, at the

summary judgment stage, credibility judgments and weighing of evidence are improper, and the facts must be viewed most favorably for the non-movant (here, Plaintiff). *Hostettler*, 895 F.3d at 852. So even if Defendant had met its initial burden to show the absence of a genuine issue of material fact as to this element, Plaintiff would have met his resulting burden because his testimony here would suffice to raise a genuine issue as to whether he *expressly* requested FMLA leave.

He alternatively would have raised a genuine issue as to whether he effectively requested leave even if he did not do so expressly. "[T]he Sixth Circuit has noted that where the 'Plaintiff did not expressly request [FMLA] leave, the critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition.'" *Rentz v. Hosp.*, 195 F. Supp. 3d 933, 941 (E.D. Mich. 2016) (quoting *Rodriguez v. Ford Motor Co.*, 382 F. Supp. 2d 928, 933 (E.D. Mich. 2005)). As noted, Plaintiff testified that he informed Ms. Tucker of his adjustment disorder, requested FMLA paperwork from her and the benefits department. Even without choosing to accept Plaintiff's stated recollection, a reasonable juror could find that these facts could reasonably apprise Defendant of Plaintiff's request to take time off for a serious health condition. *See Reeder v. Cty. of Wayne*, 177 F. Supp. 3d 1059, 1072 (E.D. Mich. 2016) (holding that the plaintiff raised a genuine issue of material fact as to whether he satisfied the FMLA notice requirements where "it [was] undisputed that Plaintiff did not complete the necessary forms required by Defendant for an approved FMLA leave,' . . . [but] it was Defendant who failed to provide those forms to Plaintiff . . . . Plaintiff was not required to unequivocally request FMLA forms." (citation omitted)); *Callaway v. Acad. of Flint Charter Sch.*, 904 F. Supp. 2d 657, 666 (E.D. Mich. 2012) (denying summary judgment where "Plaintiff allege[d] that she requested FMLA documents at least thirteen times from Defendant's representatives").

Therefore, viewing the evidence most favorably to Plaintiff (*i.e.*, the non-movant), which the Court must do at the summary judgment stage, the Court finds that a reasonable juror could conclude that Plaintiff imparted enough information to Defendant to sufficiently apprise Defendant of his request to take FMLA leave. Thus, Plaintiff has created a genuine issue of material fact as to whether he satisfied the FMLA notice requirement.

### iii. *Element Five: Defendant denied Plaintiff FMLA benefits to which he was entitled.*

Once an employee notifies his or her employer of a potential FMLA-qualifying absence, this requires the employer to notify the employee of his or her eligibility to take FMLA leave and to provide written notice of his or her rights and responsibilities. 29 C.F.R. §§ 825.300(b)-(c). If the employer has enough information to determine whether leave is being taken for an FMLA-qualifying reason, then the employer must notify the employee whether the time off will be designated and counted as FMLA leave. 29 C.F.R. § 825.300(d). But where an employer does not have sufficient information to make such a determination, the employer is directed to conduct a further inquiry. 29 C.F.R. § 825.301(a). An employer's failure to follow these notice requirements "may constitute an interference with, restraint, or denial of the exercise of an employee's FMLA rights." 29 C.F.R. § 825.300(e) ("Consequences of failing to provide notice. Failure to follow the notice requirements set forth in this section may constitute an interference with, restraint, or denial of the exercise of an employee's FMLA rights.").

Here, as discussed above, a reasonable juror could conclude that Plaintiff provided Defendant with sufficient notice of FMLA-qualifying leave requests. If so, Defendant's failure to notify Plaintiff of his eligibility to take FMLA leave and to provide written notice of his or her rights and responsibilities under the FMLA could constitute interference with or denial of his FMLA rights.

Accordingly, a genuine issue of material fact exists as to whether Defendant denied Plaintiff FMLA benefits to which he was entitled.

iv. *McDonnell Douglas Burden-Shifting*

Despite the existences of genuine issues of fact as to Plaintiff's prima facie case, summary judgment could still be appropriate. In fact, it *would* be appropriate if Defendant proffers a legitimate non-discriminatory reason for the FMLA interference that is not in turn rebutted by Plaintiff. "[I]nterference with an employee's FMLA rights does not constitute a violation if the employer has a legitimate reason unrelated to the exercise of FMLA rights for engaging in the challenged conduct." *Edgar*, 443 F.3d at 508; *see also Arban v. West Pub. Co.*, 345 F.3d 390, 401 (6th Cir. 2003) ("An employee lawfully may be dismissed, preventing him from exercising his statutory rights to FMLA leave or reinstatement, but only if the dismissal would have occurred regardless of the employee's request for or taking of FMLA leave."). Of course, the challenged conduct at issue on an FMLA interference claim is FMLA interference

Defendant does not offer a legitimate, non-discriminatory reason for its failure to provide Plaintiff with FMLA certification paperwork after he allegedly requested it, or of his eligibility to take FMLA leave and to provide written notice of his or her rights and responsibilities under the FMLA. Instead, grouping its legitimate-non-discriminatory-reason argument in terms of both FMLA retaliation and interference, Defendant offers legitimate, non-discriminatory reasons for Plaintiff's *termination*. However, absent from Defendant's brief is a specific argument explaining why Defendant was justified in interfering with Plaintiff's FMLA leave (*i.e.*, failing to notify him of his eligibility).

Accordingly, for the above-mentioned reasons, summary judgment as to Plaintiff's FMLA interference claim will be denied.

B. *FMLA Retaliation*

A plaintiff may prove an FMLA retaliation claim either through direct or indirect evidence.

*Demyanovich v. Cadon Plating & Coatings, LLC*, 747 F.3d 419, 432 (6th Cir. 2014).[6] Plaintiff

does not present direct evidence of FMLA retaliation; instead, he relies on circumstantial evidence.

Thus, the Court must engage in the *McDonnell Douglas* burden-shifting framework discussed

above. Under that framework, a plaintiff must show that:

> (1) he was engaged in an activity protected by the FMLA; (2) the employer knew
> that he was exercising her rights under the FMLA;[7] (3) after learning of the
> employee's exercise of FMLA rights, the employer took an employment action
> adverse to him; and (4) there was a causal connection between the protected FMLA
> activity and the adverse employment action.

*Donald*, 667 F.3d at 761 (quoting *Killian v. Yorozu Auto. Tenn., Inc*., 454 F.3d 549, 556 (6th Cir.

2006)). If the plaintiff establishes a prima facie case, "the burden shifts to the employer to proffer

a legitimate, nondiscriminatory rationale for discharging the employee." *Edgar*, 443 F.3d at 508.

If the employer establishes such reason, the burden then shifts to the plaintiff to show that the

employer's proffered reason is pretextual. *Id*.

i. *Prima Facie Case*

Defendant's argument that it is entitled to summary judgment on Plaintiff's FMLA

retaliation claim is similar to its argument regarding Plaintiff's FMLA interference claim—

Defendant argues that "it is disputed that Plaintiff did not request an FMLA leave of absence or

submit a request to take FMLA leave. . . . Therefore, it is undisputed that Plaintiff did not engage

---

[6] A useful example of direct evidence in this context would be a letter from the defendant to the plaintiff telling the plaintiff he or she has been fired specifically for asserting rights under the FMLA.

[7] Typically, a plaintiff shows this by showing that he or she "gave the employer notice of his intention to take leave" (or to exercise other rights under the FMLA). *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005)

in protected activity [and Defendant] had no knowledge that plaintiff was exercising his rights under the FMLA." (Doc. No. 27-1 at 12).

As discussed above, although it is undisputed that Plaintiff did not request leave through filling out the proper certification forms, there are issues of material fact as to whether Plaintiff sufficiently expressed his intention to take FMLA leave to enable Defendant to be on notice of such intention. Defendant has admitted that Plaintiff requested FMLA leave (at least in his discussion with Ms. Tucker)—and even if this request by itself somehow did not sufficiently constitute an expression of Plaintiff's intention to take FMLA leave, it is by no means clear as a matter of law that Plaintiff did otherwise not do enough to effectively express an intention to take FMLA leave. Such notice of an intention to take FMLA leave is all that is required for a plaintiff to show that he was engaging in protected activity for purposes of a prima face case of FMLA retaliation, and that the defendant was aware that he was engaged in protected activity. *See Demyanovich*, 747 F.3d at 433 (explaining that the plaintiff's act of informing a supervisor of his intent to take FMLA, without actually submitting paperwork or taking leave, was enough to show that he was engaged in protected activity under the FMLA, and that the defendant was aware that he was engaged in protected activity).

Ms. Tucker admits in her deposition that Plaintiff approached her regarding FMLA leave and she referred him to Defendant's benefits department, although she cannot "recall the specifics" of their conversation. (Doc. No. 27-3 at 35). And it is undisputed for purposes of summary judgment that Ms. Tucker participated in the decision to terminate Plaintiff. (Doc. No. 28 at ¶ 49); *Alves v. AHS Mgmt. Co., Inc.*, No. 3:15-CV-00484, 2017 WL 347555, at *3 (M.D. Tenn. Jan. 24, 2017) (explaining that a prima facie case of FMLA retaliation requires the plaintiff to show that the decision-maker (*i.e.*, "who makes the termination decision") knew she was exercising her

FMLA rights). Accordingly, there are genuine issues of material fact as to whether Plaintiff was engaged in an activity protected by the FMLA and whether Defendant knew that he was exercising his rights under the FMLA.

Defendant further argues that "there was no causal connection between Plaintiff's alleged FMLA activity and his termination [because] Plaintiff's termination was the result of his inability to meet the needs of the business." (Doc. No. 27-1 at 13). Despite Defendant's proffered legitimate, non-discriminatory reason, the Court finds that Plaintiff has presented sufficient evidence that there was a causal connection between his protected FMLA activity, and the adverse employment action based on temporal proximity. *See Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 284 (6th Cir. 2012) ("Seeger has shown causality by a preponderance of the evidence through close temporal proximity that is suggestive of retaliation."); *see also Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) ("Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation.").

Here, Plaintiff and Ms. Tucker both testified in their depositions that Plaintiff discussed FMLA leave with Ms. Tucker on August 16, 2017. (Doc. No. 26-7 at 23; Doc. No. 26-3 at 34-35). And Defendant has admitted that Plaintiff requested FMLA leave during this discussion. (Doc. No. 35-1 at ¶ 7). Plaintiff was terminated on August 28, 2020, less than two weeks later. At the prima facie case stage, a time period of two weeks could be taken by a jury to be sufficient temporal proximity to establish a causal link between Plaintiff's request for FMLA-protected leave and his termination. *See Seeger*, 681 F.3d at 283–84 (ruling that termination less than two months after

employee notified employer of his medical leave was sufficient to establish causation at prima facie stage).

Accordingly, the Court finds that genuine issues of material exist as to Plaintiff's prima facie case of FMLA retaliation. Thus, on Plaintiff's FMLA retaliation claim, Defendant has failed to persuade the Court that Plaintiff could not prove his prima facie case at trial; Defendant thus can prevail, if at all, based only on the existence of a legitimate, nondiscriminatory reason for the adverse employment actions taken against Plaintiff.

ii. *Legitimate, Non-Discriminatory Reason*

Because Defendant has produced circumstantial (rather than direct) evidence of retaliation, as just suggested the Court turns to the next step of the *McDonnell Douglas* framework: whether Defendant has articulated a legitimate, non-discriminatory reason for its actions. A defendant's burden in asserting a legitimate non-discriminatory reason is merely one of production, not persuasion, and it is not a court's job to make a credibility assessment at this stage. *See Upshaw v. Ford Motor Co.*, 576 F.3d 576, 585-86 (6th Cir. 2009) (citing *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 142 (2000)).

According to Defendant, it "is able to rebut Plaintiff's prima facie case because it terminated Plaintiff based on his inability to meet the needs of the business." (Doc. No. 27-1 at 13). Defendant asserts that "Plaintiff failed to develop and implement a labor management plan, failed to address the excessive overtime being worked by employees, failed to reduce employee turnover, and had lost the trust of his subordinate leadership team." (*Id*.). Defendant additionally contends that "Plaintiff was unable to fulfill orders in a timely manner; failed to establish a culture of safety, leading to an employee's arm being injured; lacked leadership and had lost the trust and respect of the team; and set unrealistic goals for the team and attempted to use fear as a means to achieve the goals." (*Id*.). Defendant cites to deposition testimony of its employees that support

these allegations. (*Id.*). Thus, Defendant has articulated a legitimate, non-discriminatory reason for Plaintiff's termination, and the burden switches to Plaintiff to demonstrate that these proffered reasons are pretextual.

### iii. *Pretext*

Moving to step three of the *McDonnell Douglas* framework, the Court considers whether Plaintiff has presented sufficient evidence that Defendant's reason for firing him was "pretextual." *Demyanovich*, 747 F.3d at 431. An employee can show pretext "by offering evidence that (1) the employer's stated reason had no basis in fact, (2) the stated reason did not actually motivate the employer, or (3) the stated reason was insufficient to warrant the adverse employment action." *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 590 (6th Cir. 2014). "The three-part test need not be applied rigidly. Rather, '[p]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?'" *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 285 (6th Cir. 2012) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009)). "Ultimately the plaintiff must produce 'sufficient evidence from which a jury could reasonably reject [the employer's] explanation of why it fired [or failed to rehire] her.'" *Brown v. Kelsey-Hayes Co.*, 814 F. App'x 72, 80 (6th Cir. 2020) (quoting *Chen*, 580 F.3d at 400). The plaintiff "must meet this evidentiary burden by a preponderance of the evidence." *Id.* (citation omitted).

Here, Plaintiff seeks to demonstrate pretext via the second and third method discussed above. Plaintiff argues as follows to show the existence of a genuine issue of material fact regarding pretext:

> **Safety**: UA argues that Wanner "failed to establish a culture of safety." (*See* Def. SOF No. 18; ECF 27-1, at p. 13, 20). UA fails to provide any factual support for this conclusion, and it is not supported by the record:
> • One single safety incident occurred on July 18, 2017. After UA investigated the incident and Evelyn Mason, the safety support partner at the NDH, deemed the responsible party, was terminated. (Hill Dep. 58-59; Werner Dep. 93; Deathridge Dep. 45-46; Ex. C Mason Termination Plan).

Mason did not report to Wanner, but rather to Matt Herman, the senior safety manager based in California. (Id. at 21).

• Wanner received no disciplinary action as a result of the investigation. (Werner Dep. 93; Wanner Dep. 114). The safety incident was not addressed on Wanner's July 31, 2017 mid-year performance review, despite it occurring prior to that date. (Wanner Dep. Ex. 4).

• Wanner's supervisor unequivocally stated in his deposition that Wanner was not disciplined for the safety incident because "We did not deem him accountable … for what happened here." (Werner Dep. 93).

***Staffing, Production, and Overtime:*** UA alleges that Wanner failed to appropriately staff the NDH and that such resulted in excessive overtime, high turnover, and "lost trust of subordinate leadership team" and without citing to a single specific incident makes the broad conclusion that the "totality" of these issues led to Wanner's termination. (ECF 27-1 at p. 14). The following could lead a reasonable jury to conclude UA's reasons are pretextual:

• Staffing was a team decision. Before the start of each year Wanner, Werner, and the financial partner Chuck Hanss ("Hanss") created a staffing plan based on the projected needs, along with the strategy for hiring and the allocated pay per position. (Werner Dep. 11 – 12; Deathridge Dep. 28). As needs changed within the business throughout the year, that staffing plan was altered to service those needs. (Werner Dep. 12 – 13).

• UA was having a hard time recruiting people for NDH. (Deathridge Dep. 19; Tucker Dep. 49). In 2017, UA paid warehouse employees $11.45 an hour, approximately $2 under what similar warehouse jobs paid in the area. (Deathridge Dep. 19; Wanner Dep. 49; Werner Dep. 54). Wanner did not have authority to alter the pay scale for warehouse workers in order to remain competitive in the market and had to make requests to corporate to change the pay. (Wanner Dep. 49). • HR is ultimately responsible for getting candidates for employment in the door for interviews and is ultimately responsible for ensuring new hires receive orientation and on-boarding. (Werner Dep. 17; Deathridge Dep. 29, 34; Brown Dep. 26).

• Werner admits that the turnover at the NDH was not 100% Wanner's fault. (Werner Dep. 52).

• Pinkston, the Senior Recruiter at NDH, was responsible for finding talent to fill vacant positions, and did not directly report to Wanner or Deathridge. (Wanner Dep. 53; Hill Dep. Exs. 19, 20).

• Deathridge stated that it is her responsibility for hiring new employees and getting them in the door. (Deathridge Dep. 29). She further admitted that she was too focused on hiring HR employees to hire to the staffing plan, thus causing overtime. (Id. at 44).

• Deathridge admitted to canceling two orientations in May due to poor staffing in the HR department. (Deathridge Dep. 44, 48).

***Leadership/trust/respect.*** UA alleges that Wanner failed to lacked [sic] leadership and used fear to achieve goals and without citing specific examples which led to Wanner's termination. (ECF 27-1 at p. 20).

    • There are multiple examples in his Performance Reviews that belie this contention. (Werner Dep. Ex. 4).

    • To the extent UA is complaining about use of profanity, cursing is commonplace in management meetings at UA and other upper level managers have admitted to the same. (Werner Dep. 94-96; Tucker Dep. 44; Wanner Dep. 77-78; Hill Dep. 17; Brown Dep. 37). Further, there is no evidence Wanner (or Werner or Hill who have also admitted to cursing) have been disciplined for his language. (Wanner Dep. 79, 94, 96).

(Doc. No. 29 at 17-18).

Plaintiff also points to the temporal proximity (of less than two weeks) between his discussion with Ms. Tucker regarding FMLA leave and his termination to show pretext. (*Id.* at 18). Additionally, Plaintiff asserts that Defendant has a progressive discipline policy for employee misconduct, but Plaintiff was not placed on any progressive discipline policy prior to his termination; indeed, he had never been "disciplined at all prior to his termination, was not on a performance improvement plan, and none of his annual or mid-year reviews reflect the alleged issues now claimed by [Defendant]." (*Id.* at 8).

When viewing all of this evidence in a light most favorable to Plaintiff, the Court finds that a reasonable juror could find that Defendant's reasons for Plaintiff's termination were pretextual. Although temporal proximity alone is insufficient to establish pretext, "suspicious timing is a strong indicator of pretext when accompanied by some other, independent evidence." *Seeger*, 681 F.3d at 285. Here, Plaintiff was terminated less than two weeks after he began discussing FMLA leave with a decision maker (Ms. Tucker). Additionally, up until Plaintiff's termination, he had received positive feedback on his performance reviews, including during a review that occurred around a month before his termination but prior to his requesting FMLA leave. Although Defendant does point to a complaint regarding Plaintiff's use of curse words during a meeting as

an event that occurred after that review, Plaintiff points to evidence that numerous employees testified that Defendant's employees often cursed at the workplace without consequence. Further, Defendant also based its employment decision in part on a safety incident that occurred in July, had already been investigated, and resulted in the termination of another employee.

In its Reply, Defendant asserts numerous reasons as to why the Court should disregard this evidence. For example, Defendant asserts that Plaintiff's positive written evaluations "do not tell the whole story" and that Plaintiff cannot blame others for the issues with production and labor because "the buck stops with him." (Doc. No. 37 at 2-3). Defendant also argues that Plaintiff's cursing justified his termination because it was more egregious than other employee's cursing. (*Id.* at 4). The Court finds that these arguments that are more appropriate for the jury, than for the Court to determine on summary judgment. See *Hostettler*, 895 F.3d at 852; *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150-51 (2000) (explaining that under Rule 56, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.").

Thus, the Court finds that there is are genuine issues of material fact as to whether Defendant's proffered reasons for Plaintiff's termination are pretextual. Accordingly, Defendant's as to Plaintiff's FMLA retaliation claim will be denied.

## II. Americans with Disabilities Act

### A. *ADA Discrimination*

The ADA makes it unlawful for an employer to discriminate against an employee "on the basis of disability in regard to job application procedures, [or] the hiring, advancement, or discharge [of employment.]" 42 U.S.C. § 12112(a). To establish a prima facie case of disability discrimination, "a plaintiff must show that 1) he or she is disabled; 2) otherwise qualified for the position, with or without reasonable accommodation; 3) suffered an adverse employment decision;

4) the employer knew or had reason to know of the plaintiff's disability; and 5) the position remained open while the employer sought other applicants or the disabled individual was replaced."[8] *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 306 (6th Cir. 2016) (citing *Whitfield v. Tennessee*, 639 F.3d 253, 258–59 (6th Cir. 2011)). Furthermore, the disability must be a "but for" cause of the adverse employment action. *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 318 (6th Cir. 2012) (en banc).

Defendant raises two arguments in its motion for summary judgment in regard to Plaintiff's ADA discrimination claim: (1) the record evidence demonstrates Plaintiff does not have a disability within the meaning of the ADA; and (2) even if Plaintiff had such a disability, the record evidence does not demonstrate Defendant knew, or had reason to know, of Plaintiff's disability.

i. *Element One: Plaintiff has a disability.*

Defendant argues that it should be granted summary judgment on Plaintiff's claim because the record evidence demonstrates that Plaintiff does not have a disability within the meaning of the ADA. The ADA defines disability as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1)(A). Under the ADA, "[m]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). To determine whether a disability substantially limits major life activities, courts should compare the person claiming a disability to most people in the general population. *Hostettler*, 895 F.3d at 853. The

---

[8] Although the Sixth Circuit here used the term "disabled," the statute speaks in terms not of "disabled" persons, but rather of persons "[having a] disability," and the Court will use the latter terminology.

impairment does not have to prevent, or significantly or severely restrict, a major life activity to be substantially limiting. *Id*.[9] Moreover, "'[t]he term "substantially limits" shall be construed broadly in favor of expansive coverage' and 'is not meant to be a demanding standard.'" *Id.* (quoting 29 C.F.R. § 1630.2(j)(1)(i)).

Defendant argues that Plaintiff cannot prove he has a disability as defined by the ADA, because (according to Defendant) "Plaintiff's alleged adjustment disorder appears to be nothing more than a temporary condition" and "Plaintiff testified in his deposition that he took himself off the medication he was prescribed for the alleged adjustment disorder, he could tell no difference when he was taking it[.]" (Doc. No. 27-1 at 17). Thus, Defendant contends that Plaintiff's adjustment disorder does "not qualify as a disability under the ADA." (*Id*.).

In response, Plaintiff argues that Defendant's "argument evidences a misapplication of the plain language of the statute" and that "the ADA does not require a specific minimum duration that an impairment must last in order to be substantially limiting[.]" (Doc. No. 29 at 12). Plaintiff points out that the regulations state that an impairment "lasting or expected to last fewer than six months can be 'substantially limiting.'" (*Id*.). Thus, Plaintiff argues that because Plaintiff's condition affected his "major life activities of focusing, sleeping, communicating, interacting with others, working[,]" Plaintiff's adjustment disorder qualifies as a disability under the ADA. (Id.).

The Court agrees with Plaintiff. Defendant does not provide the Court with any authority standing for its argument that a "temporary" condition cannot constitute a disability for purposes of the ADA. And the authority found by the Court indicates otherwise. *See Lowe v. Calsonickansei N. Am., Inc*, No. 1:18-CV-00027, 2020 WL 2473757, at *5 (M.D. Tenn. May 13, 2020) ("'[T]he

---

[9] In other words, in this context, "substantially limit" means something less than "significantly restrict." The Court keeps this in mind, although the semantic distinction being made here seems not very probative and thus is of minimal value to the undersigned in conducting his analysis.

pertinent inquiry is not whether plaintiff's restrictions were labelled 'temporary' or 'permanent' or the precise length of time [ ]he was under restrictions, but whether [ ]he was substantially limited in a major life activity.'" (quoting *Mullenix v. Eastman Chem. Co.*, 237 F. Supp. 3d 695, 705 (E.D. Tenn. 2017))). Because Plaintiff testified that his adjustment disorder affected his "major life activities of focusing, sleeping, communicating, interacting with others, working[,]" a reasonable jury could find that his condition is substantially limiting. (Doc. No. 27-6 at 10).

Therefore, the Court finds that Defendant has not met its initial burden on its summary judgment motion to demonstrate that the record evidence suggests that Plaintiff does not have a disability within the meaning of the ADA.

ii. *Element Four: the employer knew or had reason to know of the plaintiff's disability.*

Next, Defendant argues that Plaintiff has failed to present any evidence that Defendant was aware of his adjustment disorder, because (according to Defendant) "Plaintiff's counsel has deposed numerous Under Armour employees, and none of them have any knowledge of Plaintiff's alleged disorder." (Doc. No. 27-1 at 17).

Although Defendant's employees testified in their respective depositions that they did not have knowledge of Defendant's adjustment disorder, Plaintiff testimony disputes this.   As described above, Plaintiff testified that he discussed his adjustment disorder with Ms. Tucker, a decision maker. (Doc. No. 26-7 at 23). Additionally, Plaintiff's handwritten notes that he maintains he wrote down contemporaneously to such actions occurring also indicate that he informed Ms. Tucker of his adjustment disorder. (Doc. No. 30-9). Thus, whether any of Defendant's employees were aware of Defendant's adjustment disorder is a question for the jury to resolve. *See Hannon v. Louisiana-Pac. Corp.*, 784 F. App'x 444, 448 (6th Cir. 2019) (describing the plaintiff's deposition testimony describing her supervisor's comments, noting that the supervisor disputed those comments, and stating "[w]e emphasize that it is not our role to decide such factual disputes;

rather, a jury should decide such disputes—provided that they concern material facts"). Accordingly, the Court rejects Defendant's argument and finds that there are genuine issues of material fact as to whether Defendant had knowledge of Plaintiff's adjustment disorder.

For the above reasons, summary judgment as to Plaintiff's ADA discrimination claim will be denied.

### B. *ADA Retaliation*

"The ADA prohibits an employer from discriminating against an employee in retaliation for exercising rights under the statute." *Eyster v. Metro. Nashville Airport Auth.*, ---F. Supp. 3d--, No. 3:18-CV-01141, 2020 WL 4735029, at *9 (M.D. Tenn. Aug. 14, 2020) (citing *Allman v. Walmart, Inc.*, 967 F.3d 566, 570-72 (6th Cir. 2020)). To establish a prima facie case of ADA retaliation at trial, a plaintiff must show: (1) he engaged in an activity protected under the ADA; (2) he suffered an adverse employment action; and (3) there was a causal connection between the adverse employment action and the protected activity. *Id*. (citing *Allman*, 967 F.3d at 570-72). If such a showing is made, the burden shifts to the defendant to provide a "legitimate, nondiscriminatory reason" for the adverse employment action. *Id*. (citing *Allman*, 967 F.3d at 570-72). If the defendant proffers such a reason, the familiar *McDonnell-Douglas* burden-shifting analysis applies, and the burden shifts back to the plaintiff to show the reason given was actually a pretext designed to mask unlawful discrimination. *Id*. "A plaintiff may prove pretext by establishing the proffered reason: (1) has no basis in fact; (2) did not actually motivate the adverse action; or (3) was insufficient to motivate the adverse action." *Id*. (citing *Allman*, 967 F.3d at 570-72).

Defendant again argues that it is entitled to summary judgment on Plaintiff's ADA retaliation claim because the record is devoid of evidence that Defendant had knowledge of Plaintiff's adjustment disorder. (Doc. No. 27-1 at 18). For the reasons stated above, whether

Defendant had knowledge of Plaintiff's condition is an issue genuinely in dispute. Accordingly, this argument is rejected.

Defendant also argues that even if Plaintiff demonstrates a prima facie case of ADA discrimination and retaliation, it is nevertheless entitled to summary judgment on these claims because the record evidence shows that Defendant's reasons for Plaintiff's termination were not pretextual. As the Court has already discussed above in analyzing Plaintiff's FMLA claim, genuine issues of material fact exist as to whether Defendant's proffered reasons for Plaintiff's termination are pretextual.

For these reasons, Defendant's motion for summary judgment as to Plaintiff's ADA retaliation claim will be denied.

## III. Tennessee Disability Act

"'A claim brought under the THA [Tennessee Handicap Act, now known as the TDA] is analyzed under the same principles as those utilized for the Americans with Disabilities Act.'" *Cardenas-Meade v. Pfizer, Inc.*, 510 F. App'x 367, 370 (6th Cir. 2013) (quoting *Sasser v. Quebecor Printing (USA) Corp.*, 159 S.W.3d 579, 584 (Tenn. Ct. App. 2004)) (alterations in the original); *see also Phipps v. Accredo Health Grp., Inc.*, No. 215CV02101STACGC, 2016 WL 3448765, at *15 (W.D. Tenn. June 20, 2016) ("Claims under the TDA are analyzed under the same principles and standards as those utilized for the ADA."); *Barnes v. Goodyear Tire & Rubber Co.*, 48 S.W.3d 698, 705 (Tenn. 2000) ("We, therefore, may look to federal law for guidance in enforcing our own anti-discrimination laws."). The only difference in analyzing the two statutes is that the TDA does not require a "reasonable accommodation component" *Bennett v. Nissan N. Am., Inc.*, 315 S.W.3d 832, 842 (Tenn. Ct. App. 2009) (quotation marks omitted), but that is not relevant here.

Accordingly, Defendant's Motion for Summary Judgment as to Plaintiff's TDA claim fails for the same reasons as articulated above in the Court's discussion concerning the ADA.

## CONCLUSION

Sometimes, a defendant has numerous arguments in its defense, but they are arguments that will bear fruit for the defendant, if ever, only at trial and not at the summary-judgment stage. This is one of these cases; as discussed above, whatever the merits of Defendant's arguments, they do not establish as to any of Plaintiff's claim that there is no genuine issue of material fact or that Defendant is entitled to judgment as a matter of law. For this reason, Defendant's Motion for Summary Judgment will be **DENIED** and this case will proceed to trial.

An appropriate order will be entered.


*Eli Richardson*
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE